IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| TOM CONLEY and CONLEY GROUP, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF WEST DES MOINES, IOWA, CHERRY RENEE HARDMAN, in her individual and official capacities, MATTHEW MCKINNEY, in his individual and official capacities, KEVIN TREVILLYAN, in his individual and official capacities, GREG HUDSON, in his individual and official capacities, and RUSS TRIMBLE, in his individual and official capacities, <br><br> Defendants. | No.: _____ <br><br> **COMPLAINT** |

**Parties, Jurisdiction, and Venue**

1. Plaintiff Tom Conley is an adult resident of the State of Iowa. Conley Group, Inc. is an Iowa corporation owned solely by Tom Conley.

2. Defendant City of West Des Moines, Iowa is a municipality of the State of Iowa with its administrative offices located at 4200 Mills Civic Parkway, West Des Moines, Iowa. Defendants Cherry Renee Hardman, Matthew McKinney, Kevin Trevillyan, Greg Hudson, and Russ Trimble were, during the period relevant to this lawsuit, members of the West Des Moines City Council. Hardman, McKinney, Trevillyan, Hudson, and Trimble are sued in their individual and official capacities.

3. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

4. Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because it is

where the defendants reside and in which a substantial part of the events and omissions giving rise to the claims occurred.

**Factual Background**

5. Tom Conley is a security professional with, at the time of the events giving rise to the claims, more than 45 years of experience. He is the President, CEO and 100% owner of Conley Group, Inc., a company that provided security and related services throughout central Iowa since 1977. Conley Group, Inc. provided security services to individuals, private businesses, nonprofit organizations, and governmental entities. Tom Conley personally provided consulting services through Conley Group, Inc., including testifying as an expert witness in court proceedings on numerous occasions. Conley served nearly 27 years in the U.S. Navy, retiring honorably in 2017 at the rank of Commander (0-5).

6. In early 2018 Conley Group began providing armed security services at the West Des Moines City Hall, initially on a temporary basis. Because the City of West Des Moines decided to make armed security at city hall permanent, in December 2019 the city solicited bids for the service. Conley Group, Inc. was selected by the City of West Des Moines after a competitive bidding process.

7. Conley Group, Inc. performed armed security services under a contract with the City of West Des Moines beginning February 1, 2020. The contract term was to run through December 31, 2021, with renewal for additional one-year terms. The contract allowed for termination for cause with five days' notice and termination without cause with 30 days' notice.

8. Conley Group, Inc. performed under the security services contract to the satisfaction of the City of West Des Moines. Conley received positive feedback from city

officials about the employees who worked at City Hall and understood from his conversations with those officials that the city intended to renew the security contract when the initial term ended on December 31, 2021. The renewal would be for an additional year.

9. Conley Group, Inc. also had a contract with the City of Des Moines to provide security services at its City Hall and other city-owned buildings. As with West Des Moines, Conley had consistently received positive feedback from Des Moines city officials about Conley Group, Inc.'s performance of its security contract.

10. On May 25, 2020, George Floyd died while being taken into custody by Minneapolis, Minn. police officers. There were numerous protests in the City of Des Moines and elsewhere about Floyd's death and other issues such as accusations of racism and policing. In addition to lawful protests, there were a series of riots in Des Moines that involved property damage and assaults.

11. Conley Group, Inc. security personnel, including Tom Conley himself, worked in the City of Des Moines under its security contract to protect life and property during the Des Moines riots.

12. Conley was alarmed at media coverage in the Des Moines Register of the Des Moines riots. He believed that the many articles, particularly those written by reporter Andrea Sahouri published in the Des Moines Register on January 10 and January 11, 2021, were providing a slanted, highly distorted and grossly unfair coverage of the actions of Iowa law enforcement officials. Conley believed that Sahouri had a conflict of interest in her reporting because she had been arrested by Des Moines police during one of the riots and was facing criminal charges at that time.

13. On or about January 13, 2021, Conley submitted a letter to the editor of the Des

Moines Register. The letter responded to the four articles published by the Des Moines Register on January 10 and 11, 2021, that Conley believed attacked the actions of law enforcement officers.

14. Conley's letter to the editor resulted in public records requests being submitted to the City of Des Moines for communication he had with city officials. The Des Moines Register published several stories reporting on emails Conley had sent that described the criminal behavior he had witnessed by some protestors. The stories also reported on Conley's personal Facebook page where he had made comments critical about some members of the central Iowa BLM movement. The stories conflated Conley's comments on specific acts of criminal behavior with those involved in lawful protest.

15. On July 20, 2021, the West Des Moines City Manager contacted Conley by email and asked him to attend a meeting at City Hall. The message read, *"Tom, could you come to the West Des Moines City Hall, City Managers office for a meeting at 4:00 pm, Thursday July 22. The meeting will be myself and council person Renee Hardman. Thank you."* Conley agreed to the meeting. When he arrived, he was met by the city manager, Hardman, and the city attorney, Richard Scieszinski. Conley did not know the city attorney would be present and made a joking comment of whether he needed to have his attorney present at the meeting as well. In response, all three individuals responded that this was "just a conversation".

16. Hardman then asked Conley to explain to her his background, which Conley did. Hardman then said she and two sisters were raised by a single mother who had taught them the value of morals and hard work. Hardman stated she had gone to college and had worked in high-level corporate jobs in the Des Moines area. She said her current position was as the executive director of Big Brothers and Big Sisters.

4

17. Hardman then said she had some concerns about Conley's comments as reported in the Des Moines Register and that she was on the fence about whether she would support Conley's contract with the City of West Des Moines. Hardman stated she had prayed about it and decided the best way for her to make a decision was to look Conley in the eye and ask him questions.

18. Hardman then questioned Conley about his comments as reported in the Des Moines Register and what his own personal values were. She also asked Conley about a comment posted on the Twitter account he shared with his company regarding PetSmart having a large BLM flag in its window. She stated she was disturbed by Conley's comments and had received constituent calls about them.

19. Conley replied that he had been in business for 45 years and never had any founded complaints about how he or one of his employees had treated anyone due to race or any other factor. He said that his security business had provided services in diverse communities and that their spotless record was proof of how he and his employees treat all people equally and well.

20. Hardman then asked Conley what his views were on BLM (understood by Conley to refer to Black Lives Matter) and what he knew about BLM. Conley replied that he believed in the right to engage in free speech and peaceful assembly. He said he was opposed to all criminal activity, including that committed in the name of BLM. He said his comments had been taken out of context in the Des Moines Register stories.

21. Conley told Hardman that his experience with BLM and Antifa was limited to his numerous personal encounters with BLM and Antifa group members and news reports about activity in Des Moines and elsewhere that was attributed to BLM and Antifa. Conley

related experiences he had with a group of rioters who threw bricks and rocks at Conley, striking him on multiple occasions and causing injury to him. After several weeks of rioting, two members of the group approached Conley peacefully and apologized to him, stating they thought he was a police officer, not a security officer. They told Conley that they had been hired by BLM and traveled from Ohio to Des Moines to "raise Hell," that is to intimidate people and damage property. Both individuals said they were being paid by the hour and had been paid all their expenses for travel, food, and lodging.

22. When Conley relayed his experience with the paid BLM members Hardman became visibly angry. Conley pointed out the group from Ohio were all Caucasian. Hardman then appeared to get angrier and said aggressively, "why didn't you say so?" Conley said it did not matter the ethnicity of a person who is pummeling you with bricks and rocks.

23. Hardman then spoke at length about BLM and the hardships the black community had faced and continued to face. Hardman suggested Conley should do more research about BLM and offered to meet later to educate Conley on BLM. Conley thanked her for that opportunity.

24. During the meeting Hardman said that her experience with the security officers provided by Conley Group, Inc. was that they were all very kind and professional. Shortly after the July 22, 2021, meeting, Conley learned that the proposed consent agenda for the August 2, 2021, City of West Des Moines City Council meeting included an item for the cancellation of the Conley Group, Inc. contract. Conley, through counsel, contacted the city attorney to protest this and to point out it would violate Conley's rights under the First and Fourteenth Amendments for the contract to be cancelled because of Conley's speech and beliefs.

25.     Cancelation of the Conley Group, Inc. contract was then removed from the August 2, 2021, consent agenda. It was rescheduled for the next regular City Council meeting of Monday, August 16, 2021.

26.     The City of West Des Moines scheduled a special meeting of the City Council for August 13, 2021, the Friday before the Monday meeting where cancelation of the Conley Group, Inc. contract was on the agenda.

27.     During the August 13, 2021, the City Council went into closed session for the purpose "to discuss pending/threatened litigation." Iowa Code § 21.S(l)(c) permits a city council to have a closed session "[t]o discuss strategy with counsel in matters that are presently in litigation or where litigation is imminent where its disclosure would be likely to prejudice or disadvantage the position of the governmental body in that litigation."

28.     During the closed session Hardman could be heard yelling angrily at the others present.

29.     The following Monday, August 16, 2021, the City Council voted unanimously to cancel the contract with Conley Group, Inc. The meeting was attended by several BLM members who celebrated afterwards outside of City Hall. After the August 16, 2021, council meeting Hardman had a text message exchange with a supporter that revealed she had imposed her will on her fellow council members and that she recognized the cancellation of the Conley contract was illegal:



30. After cancellation of the West Des Moines contract, Hardman was at a regularly scheduled event for municipal leaders in Central Iowa when she encountered Des Moines city manager Scott Sanders. Hardman asked Sanders a question to the effect of "when are you going to get rid of Conley too?" Hardman, directly and through proxies, engaged in communications with City of Des Moines council members to demand that they cancel the Conley Group, Inc.'s contract with the City of Des Moines because of Conley's speech and beliefs.

33. In the aftermath of the cancellation of the West Des Moines contract there were several stories in the Des Moines Register on the topic of when the City of Des Moines would follow suit and cancel its contract with Conley Group, Inc.

34. Conley was in the process of selling the regular security portion of Conley

8

Group, Inc. to another company during the summer of 2021. Because of the threat to the ability to successfully complete this transaction, Conley agreed with the City of Des Moines to end his security contract before it would have ended by its own terms.

35. The cancelation of the West Des Moines security contract caused Conley Group, Inc.'s regular security business to be worth substantially less when Conley sold it to another company.

36. The cancelation of the West Des Moines security contract caused the end of Conley's successful consulting work and the loss of present and future income from it.

37. The cancelation of the West Des Moines security contract caused Conley stress, anxiety, and damage to his reputation.

**I. First Amendment Retaliation**

38. The Civil Rights Act of 1871, later codified at 42 U.S.C. § 1983 and as interpreted by the U.S. Supreme Court, provides that those acting under color of state law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings" for the "deprivation of any rights, privileges, or immunities secured by the Constitution."

39. The Fourteenth Amendment to the Constitution guarantees the right to due process of law. The U.S. Supreme Court has interpreted the Fourteenth Amendment to incorporate the rights of free speech and association protected by the First Amendment.

40. The U.S. Supreme Court held in *Board of County Commissioners, Wabaunsee*

*County, Kansas* v. *Umbehr,* 518 U.S. 668 (1996) that an independent contractor of a municipality has a right to be free from retaliation for exercise of his free speech rights over a matter of public concern.

41. *As* the Eighth Circuit has stated, "[d]iscrimination against speech because of its message is presumed to be unconstitutional, and viewpoint discrimination is an egregious form of content discrimination." *Wishnatsky* v. *Rovner,* 433 F.3d 608, 611(8th Cir. 2006).

42. The cancelation of the West Des Moines security contract was done because of Conley's exercise of his right to free speech and association and to retaliate against him for having views on a matter of public concern different from that of the defendants. At no time before cancelation of the contract did the Conley Group, Inc. fail to perform any term of the contract in any material way. The cancelation of the West Des Moines security contract and Hardman's actions to threaten Conley's Des Moines security contract caused substantial economic and noneconomic losses to Conley and Conley Group, Inc.

43. Because the right to be free from retaliation for exercise of First Amendment rights is clearly established, the individual defendants face personal liability in their individual capacities, including punitive damages, for their retaliation against Conley and Conley Group, Inc.

44. The City of West Des Moines is liable for damages caused by an official policy done in violation of constitutional rights.

**II.    Tortious Interference with Business Contracts**

45. Under Iowa law "The elements of this tort include the following: " '(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to

perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.' " *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Nesler v. Fisher & Co.,* 452 N.W.2d 191, 198 (Iowa 1990))." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)

46. The defendants City of West Des Moines and Hardman interfered with the contractual relations between Conley Group and several of Conley Group's clients, including the City of Des Moines.

47. This interference was intentional and improper and resulted in damage to Conley Group.

### III. Defamation

48. The Defendants defamed Tom Conley either directly or by implication both by their statements and their actions.

49. The actions of the Defendants constituted defamation per se.

50. Tom Conley was damaged because of this defamation.

### Request for Relief

The plaintiffs request the following relief:

A. An award to plaintiffs of all damages that each is entitled to under 42 U.S.C. § 1983, including compensatory damages against all defendants and punitive damages against individual defendants.

B. An award to plaintiff Conley Group of compensatory damages against the City of West Des Moines and defendant Hardman for damages arising from the Tortious

Interference with Business Contract.

C. An award to Tom Conley against all defendants for compensatory and punitive damages arising from their defamation.

D. Award attorney fees, costs, and any other relief as the Court deems appropriate.

**Jury Demand**

Plaintiffs demand trial by jury.

                    MUNRO LAW OFFICE, P.C.

                    By: /s/Kenneth R. Munro
                        Kenneth R. Munro  AT0005581
                        4844 Urbandale Avenue, Suite B
                        Des Moines, IA  50310
                        Phone: (515) 279-0443
                        Fax:  (515) 279-0445
                        Email:  ken.munro@munrolawoffice.com

                  ATTORNEY FOR PLAINTIFFS