IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| TOM CONLEY and CONLEY GROUP, INC., | ) ) | Case No. 4:23-cv-00053-SMR-HCA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER ON DEFENDANTS' MOTION |
| v. | ) | TO DISMISS |
| | ) | |
| CITY OF WEST DES MOINES, IOWA, | ) | |
| CHERRY RENEE HARDMAN, in her | ) | |
| individual and official capacity, MATTHEW | ) | |
| MCKINNEY, in his individual and official | ) | |
| capacity, KEVIN TREVILLYAN, in his | ) | |
| individual and official capacity, GREG | ) | |
| HUDSON, in his individual and official | ) | |
| capacity, and RUSS TRIMBLE, in his | ) | |
| individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs accuse the municipal Defendants of violating the First Amendment to the United States Constitution when they decided to cancel a security contract between the municipality and the Plaintiff-company. They further claim that after the cancellation of the contract, specific individual Defendants engaged in conduct which tortiously interfered with contracts the company had with other clients. Plaintiffs also allege that Defendants defamed the owner of the company by implying that he was a racist through various statements.

Defendants have filed a motion to dismiss the case. They argue that Plaintiffs fail to allege sufficient facts to support their assertions at the pleading stage and dismissal is required for failure to state a claim.

1

## I.     BACKGROUND

### A.  Factual Background[1]

Plaintiff Conley Group, Inc. is a security services firm.  Plaintiff Tom Conley is the firm's President, CEO, and sole shareholder.  They brought this case alleging that the City of West Des Moines (the "City") and individual members of its city council unlawfully retaliated against them after the publication of comments made by Conley[2] regarding the protests and unrest that occurred in 2020.

Conley Group and the City entered into a contract for security services at West Des Moines City Hall beginning in early 2018 on a temporary basis.  Once the City decided to have security at City Hall on a permanent basis, it began a bidding process where the Conley Group was selected. In January 2021, Conley wrote a letter to the editor of the Des Moines Register to express his belief that the newspaper's coverage of law enforcement actions during the summer of 2020 were unfair and distorted.  Following this letter, a series of stories appeared in the Des Moines Register about Conley and Conley Group, including information drawn from emails received as part of a public information request.

On July 20, 2021, West Des Moines City Manager Cherry Renee Hardman asked Conley to attend a meeting at City Hall.  At the meeting, Hardman told him that she had hesitations about supporting a renewal of the City's contract with Conley Group, which was set to expire at the end of 2021.  She told him that she was concerned about some of his comments that were reported in

---

[1] The facts discussed in this Section are drawn from the Amended Complaint.  On a motion to dismiss for failure to state a claim, a court must accept as true all factual allegations in the light most favorable to the nonmoving party.  *See Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014).

[2] For clarity, the individual Plaintiff will be referred to by his last name and the company-Plaintiff will be referred to by its corporate name when the distinction is relevant.

the Des Moines Register and she had received calls from constituents about them.  Conley responded that his company worked in diverse communities and had a spotless record regarding its treatment of people.

Hardman and Conley spoke about his views of the activist groups Black Lives Matter and Antifa.  Conley said he had limited personal experience with them, but one encounter involved a group of rioters throwing bricks and rocks at him.  He said he later received an apology from two individuals who apparently told him that they had been paid to travel to Iowa to participate. Hardman and Conley continued to discuss similar matters before the meeting concluded.

The Amended Complaint alleges that cancellation of the contract for the Conley Group had been on the consent agenda for the next city council meeting scheduled for August 2, 2021.  It was later removed from the agenda after the City received correspondence from Conley's legal counsel regarding the legality of such an action.  Cancellation of the contract was soon added to the agenda for the next city council meeting scheduled for Monday, August 16, 2021.

On the Friday before the regularly scheduled meeting on August 16, 2021, the city council held a special meeting in closed session to "discuss pending/threatened litigation." *See* Iowa Code § 21.5(1)(c) (permitting a closed session of a city council meeting to discuss legal strategy for pending or imminent litigation).  Plaintiffs allege that during the closed session "Hardman could be heard yelling angrily at the others present."

The following Monday, the city council voted unanimously to cancel the contract between the City and Conley Group.  The Amended Complaint contains an image of a text message from Hardman where she told an unidentified recipient that she had lobbied other city council members to cancel the Conley Group contract while acknowledging a likelihood of litigation about the action.

-3-

After the City's decision to terminate the contract with Conley Group, Plaintiffs allege that Hardman approached Des Moines City Manager Scott Sanders at a gathering of municipal leaders to ask when the City of Des Moines was "going to get rid of Conley too?"  The Amended Complaint states that Hardman demanded the City of Des Moines cancel its contract with the Conley Group through proxies as well.

The Des Moines Register soon published stories regarding the City's decision to cancel the contract with Conley Group, along with speculation about whether other cities would do the same. According to the Amended Complaint, Conley was engaged in the sale of the security portion of the Conley Group in the summer of 2021.  However, "[b]ecause of the threat to the ability to successfully complete this transaction, Conley agreed with the City of Des Moines to end his security contract" before the term expired.

### B.  Procedural History

Plaintiffs filed their original complaint on February 7, 2023.  After Defendants moved to dismiss, they filed an Amended Complaint.  Plaintiffs assert three claims against Defendants.  In Count I, they allege that Defendants engaged in unconstitutional retaliation against them for Conley's exercise of his First Amendment rights.  Count II claims that Hardman and the City tortiously interfered with the Conley Group's business contracts.  And in Count III, Defendants are alleged to have defamed Conley directly and impliedly branded him a racist in statements published to third parties.

Defendants filed a renewed motion to dismiss for failure to state a claim.  They argue that Plaintiffs do not allege any specific facts to support liability against Defendants McKinney, Trevillyan, Hudson, or Trimble.  Defendants fault Plaintiffs for failing to identify any specific speech or protected conduct that was subject to retaliation by the City.  The motion to dismiss

argues that Conley does not have individual standing to press a First Amendment retaliation claim for damages to Conley Group.  Additionally, Defendants maintain that there are no facts pled in the Amended Complaint to support a First Amendment claim on behalf of the Conley Group.

As to the tortious interference claim in Count II, Defendants argue that Plaintiffs fail to state a claim because there is not sufficient factual support in the Amended Complaint, and the pleadings contain only a recitation of the legal elements.  Finally, they seek dismissal of the defamation claim in Count III.  Plaintiffs resist the motion to dismiss in its entirety, asserting that Defendant mischaracterize the pleadings and misstate the law.

## II.    DISCUSSION

### A.  Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court must accept as true all factual allegations in the light most favorable to the nonmoving party in a motion to dismiss for failure to state a claim.  *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011).  It must also draw "all reasonable inferences from the pleadings in favor of the non-moving party."  *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (citation omitted).  A complaint is not adequately pled "if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (cleaned up) (quoting *Twombly*, 550 U.S. at 557).

Under the Rule 8 standard, a plaintiff is required only to set forth a "short and plain statement of the claim."  Fed. R. Civ. P. 8(a).  The complaint must allege with sufficient factual "heft to 'show that the pleader is entitled to relief.'"  *Twombly*, 550 U.S. at 557 (cleaned up)

(quoting Fed. R. Civ. P. 8(a)); *see also Johnson v. Precythe*, 954 F.3d 1098, 1101 (8th Cir. 2020) ("Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (cleaned up) (citation omitted).  To survive a motion to dismiss, plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level" by presenting claims that are "plausible on their face." *Twombly*, 550 U.S. at 555, 570 (cleaned up).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

When a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).  Allegations pled in a complaint that, even if true, "could not raise a claim of entitlement to relief" the complaint must be dismissed. *Twombly,* 550 U.S. at 570.

Courts may properly consider "documents necessarily embraced by the complaint," including "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

### B.  First Amendment Retaliation

#### 1.  Legal Standard

The First Amendment prohibits government officials from retaliating against an individual for exercise of their free speech rights.  *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998) (noting that First Amendment retaliation "threatens to inhibit exercise of the protected right") (citation omitted).  Motive of the government

officials is "central" to any First Amendment retaliation claim. *Laney v. City of St. Louis, Mo.*, 56 F.4th 1153, 1157 (8th Cir. 2023).

The United States Supreme Court has recognized that a public employee has a right "to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). This constitutional principle means that a public employer cannot "discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *McGee v. Pub. Water Supply Dist. #2*, 471 F.3d 918, 919 (8th Cir. 2006) (quoting *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). However, a public employee's freedom of speech may be properly restricted if the speech has potential to affect governmental operations. *Garcetti*, 547 U.S. at 418. The First Amendment rights of independent contractors are similarly protected from government retaliation. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 720 (1996) (rejecting the proposition "that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgment of First Amendment rights").

The analysis regarding whether a public employer has engaged in unlawful retaliation in violation of the First Amendment considers three factors. The first inquiry is whether the matter was of a "public concern" and its connection to the speaker's employment. *Heritage Constructors, Inc. v. City of Greenwood, Ark.*, 545 F.3d 599, 601 (8th Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Second, the interests of the speaker must be balanced against the interests of the government in restricting the specific speech. *Id*. (citing *Pickering v. Bd. of Ed. of Twp. High Sch.*, 391 U.S. 563, 568 (1968)). Third, consideration must be given as to whether the governmental employer would have made the same decision without the protected speech or conduct. *Id*. (citing *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

2.   Analysis

a.   Article III Standing

Before analyzing whether the Amended Complaint states a claim for First Amendment retaliation, the Court must determine which Plaintiffs have standing. *McNaught v. Nolen*, 76 F.4th 764, 768 (8th Cir. 2023) (stating "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (citation omitted). A plaintiff must establish three elements that comprise the "irreducible constitutional minimum" for standing: (1) an injury in fact, (2) which is fairly traceable to the conduct of the defendant, and (3) is likely to be redressed through a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It is sufficient at pleadings stage for a plaintiff to assert "general factual allegations of injury" to proceed. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013). However, a plaintiff must have standing for each claim and each form of relief sought. *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019) (citing *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)).

Beyond the constitutional principles for standing derived from Article III, courts have recognized "prudential limits on standing." *Oti Kaga, Inc. v. S. Dakota Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). The Supreme Court has explained that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement" a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This prudential limit on standing can arise in cases involving a corporate entity because the corporation "is an entity separate and distinct from its shareholders" meaning that "a shareholder does not have standing to assert a claim for harm suffered by the corporation." *In re*

*AFY, Inc.*, 902 F.3d 884, 890 (8th Cir. 2018). In other words, a "shareholder must allege that he has personally 'suffered a direct, nonderivative injury' to proceed independent of the corporation." *Id*. (quoting *Potthoff v. Morin*, 245 F.3d 710, 717 (8th Cir. 2001)).

Defendants argue that Tom Conley seeks to do just that in Count I. They assert that he individually lacks standing to bring a claim for First Amendment retaliation because the Amended Complaint alleges damages suffered by Conley Group. Defendants contend that he was not an employee of the City nor did he have a personal contract with it—the Conley Group did. As such, they assert that Conley suffered no personal injury and cannot assert personal standing through the pecuniary loss suffered by the company.

Plaintiffs respond that Conley has standing to pursue a First Amendment retaliation claim. They emphasize that he is the sole owner of his company and filed this lawsuit after the City retaliated against his company for his exercise of First Amendment rights. Plaintiffs point to the Supreme Court's decision in *O'Hare* as supporting their position on Conley's standing. That case pertained to a lawsuit brought by the operator of a towing company who had been removed from a list of companies contracted by a city for services. *O'Hare Truck Serv.*, 518 U.S. at 715–16. The basis for the removal from the towing contractor list was allegedly because the owner of the company refused to contribute to the city mayor's reelection campaign. *Id*. The Court had "no doubt" that if the owner of the towing company "had been a public employee whose job was to perform tow truck operations, the city could not have discharged him for refusing to contribute" to the mayor's campaign. *Id*. at 720. Given the obvious implication of First Amendment rights for a public employee, the Court "decline[d] to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees." *Id*. at 726.

*O'Hare* does not support Plaintiffs' position on individual standing for Conley. They advance an inference that because standing is a threshold question before consideration of the merits of a claim, the *O'Hare* Court must have concluded *sub silentio* that the owner of the towing company had individual standing in that case. [ECF No. 15-1 at 13–14]. Plaintiffs' interpretation is incorrect, as shown by subsequent cases.

When confronted with a similar standing issue as this case, the United States Court of Appeals for the Eighth Circuit held that "the shareholder standing rule applies to civil rights actions brought pursuant to 42 U.S.C. § 1983 by shareholders claiming injury to their corporations." *Potthoff*, 245 F.3d at 717. The plaintiff in *Potthoff* also argued that *O'Hare* recognized individual standing to bring claims for injuries to corporate entities. The panel held that *O'Hare* "does not contradict the application of the shareholder standing rule" because the owner and the company were petitioners in *O'Hare* and the application of standing "was neither raised nor discussed." *Potthoff*, 245 F.3d 717 n.6. Rather, the sole issue addressed by the Supreme Court was whether First Amendment protections afforded public employees could also be constitutionally extended to independent contractors. *Id*. (citing *O'Hare*, 518 U.S. at 715). Plaintiffs' emphasize that Tom Conley is the sole shareholder of Conley Group, but that is not relevant for application of the shareholder standing rule. *Id*. at 716 (barring shareholder standing "even if the plaintiff is the sole shareholder of the corporation"); *see also In re AFY*, 734 F.3d at 820 (rejecting shareholder standing for an S corporation despite its pass through status for tax purposes).

Accordingly, Conley has no individual standing to assert a First Amendment retaliation claim. He has suffered no personal injury as required by Article III standing doctrine.

b.  Conley Group

Defendants also move to dismiss Count I as brought by Conley Group.  They maintain that the Amended Complaint provides very few factual allegations regarding the actions of the company.  There are no averments that Conley Group made any speech that was allegedly subject to retaliation, only speech by Conley individually.  Plaintiffs' resistance to the motion to dismiss does not address any actions by Conley Group.   They appear to concede that the disputed statements were made by Conley as an individual which are "peculiar to him alone."  [ECF No. 15-1 at 15].  The Court can discern no factual allegations in the Amended Complaint sufficient to state a claim for First Amendment retaliation against Conley Group as an entity.  Count I for First Amendment retaliation must be dismissed.

*C.  Tortious Interference with Business Contract*

Count II of the Amended Complaint brings a claim for tortious interference with business contracts against the City and Defendant Hardman.  Plaintiffs allege that Hardman contacted other clients of Conley Group, including the City of Des Moines, to "demand" that those clients terminate their contracts with the company.  Despite the reference to "clients" in the pleadings, the Amended Complaint identifies only the City of Des Moines as a target of the alleged tortious interference.

Defendants argue that the Amended Complaint fails to state a claim for tortious interference because it only advances vague allegations about contacts with the company's other clients.  Plaintiffs characterize Defendants' argument as "specious" and insists that this "is not a complicated case, and it is difficult to understand what more would be required, factually, to state a cause of action for tortious interference."  [ECF No. 15-1 at 15–16].

To state a claim for tortious interference with a contract, a plaintiff must plead: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 151 (Iowa 2013) (quoting *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008)). Any interference with a contract must be "improper." *Hunter v. Bd of Trs. of Broadlawns Med. Ctr.*, 481 N.W.2d 510, 518 (Iowa 1992) (citation omitted). Whether any actions were improper depends on the nature of the alleged conduct, its motivation, and a balancing of the interests of each party. *Kern*, 757 N.W.2d at 662.

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a plaintiff must allege sufficient facts to support a plausible inference "that the defendant is liable for the misconduct alleged." *Braden v. Wal-Mart*, 588 F.3d 585, 594 (8th Cir. 2009) (citation omitted). Although a plaintiff is entitled to "reasonable inferences" to be drawn from the pleadings, such deference does not extend to "legal conclusions or 'formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 681.

Plaintiffs allege that after Defendants contacted the City of Des Moines to "demand" they terminate their contract with Conley Group, the company "was forced to let the City of Des Moines out of its contractual obligations to avoid additional negative publicity and increased damages." [ECF No. 13 ¶ 48]. The Amended Complaint describes a single factual circumstance where Defendant Hardman spoke with the Des Moines City Manager to "demand" termination of the contract with the company.

There are no other factual allegations to support a claim for tortious interference— particularly that "the interference *caused* the third-party not to perform, or made performance more

burdensome or expensive." *Jones*, 836 N.W.2d at 151 (emphasis added) (citation omitted).  This is precisely an example of an "unadorned, the-defendant-unlawfully-harmed-me accusation" that the Supreme Court has expressly found to be insufficient to state a claim.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Plaintiffs only advance "naked assertions devoid of further factual enhancement" in support of their claim for tortious interference.  *Id*. (cleaned up).

Furthermore, the Amended Complaint itself avers that Conley Group's termination of its contract with the City of Des Moines was Conley's decision.  [ECF No. 13 ¶ 48].  He made this decision to avoid "negative publicity" but the Amended Complaint does not allege how Defendants were responsible for this negative publicity.  *Id*.  Count II falls far short of stating a claim for tortious interference with business contracts.

### D.  Defamation

Finally, in Count III of the Amended Complaint, Plaintiffs accuse Defendants of defaming Conley by "statements directly and impliedly that Tom Conley was a racist."  [ECF No. 13 ¶ 51].  Defendants also seek dismissal of this claim.  The Amended Complaint alleges that the sequence of events in 2021 constituted defamation by Defendants.  It began with Conley's statements on social media and the reporting of his comments by Des Moines Register and ended with the termination of Conley Group's contract.  Plaintiffs maintain that these "unusual actions" lead to the "clear implication . . . that Tom Conley was a racist and needed to be punished."  [ECF No. 15-1 at 17].

Defamation can be in the form of libel or slander.  *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001).  These "twin torts" differ in the medium of communication— libel are written statements and slander are oral statements.  *Bierman v. Weier*, 826 N.W.2d 436, 444 (Iowa 2013) (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004)).

To establish a *prima facie* case of defamation, "the plaintiff must show the defendant (1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). Defamation only reaches factual assertions, not opinions. *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021) (observing "speech that is considered 'rhetorical hyperbole' [or a] 'vigorous epithet'" is not actionable as defamation) (citation omitted). Statements that communicate the speaker's opinion are protected under the First Amendment. *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (holding "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."). Whether a statement is capable of having a defamatory meaning is a question for a court to determine. *See Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989).

Here, Plaintiffs allege that Defendants defamed Conley by implication. Iowa law recognizes not only express defamation, but also defamation by implication. *See Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). The elements of defamation by implication require that a defendant: "(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts." *Id.* (citation omitted) Defamation by implication requires the defendant "intend or endorse the implication." *Nunes v. Lizza*, 12 F.4th 890, 898 (8th Cir. 2021) (cleaned up).

The Amended Complaint sets forth the defamation claim in four short paragraphs. Crucially, it does not identify *any* statement made by Defendants, much less a series of facially nonlibelous statements which allow the audience to "connect the dots" to arrive at a defamatory implication. *Nunes*, 12 F.4th at 897 (observing that "arrangement and phrasing of apparently nonlibelous statements cannot hide the existence of a defamatory meaning") (cleaned up) (citation

-14-

omitted). The absence of any specific statement is inexplicable because Plaintiffs allege that "Defendants made statements *directly* . . . that Tom Conley was a racist." [ECF No. 13 ¶ 51] (emphasis added). Plaintiffs' resistance to the motion to dismiss argues that "[t]he clear implication of these unusual *actions* was that Tom Conley was a racist and needed to be punished." [ECF No. 15-1 at 17] (emphasis added). None of the actions recounted in the resistance identify any statements made by any Defendant. Plaintiffs essentially seek to impose liability for defamation against Defendants based on their actions—actions about whether the City of West Des Moines should continue a contractual relationship with a security firm. This is not a proper basis for a defamation claim.[3]

## III.    CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is GRANTED. [ECF No. 14].

IT IS SO ORDERED.

Dated this 4th day of March, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[3] In light of the shortcomings in Count III of the Amended Complaint, the Court does not address the question whether a statement that an individual is a "racist" is actionable for defamation purposes.